**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**March 22, 2004**

**Charles R. Fulbruge III**
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 02-60886
_____

GARY LEE and AMANDA LEE,

                                        Plaintiffs-Appellants,

        versus

E.I. DU PONT DE NEMOURS AND COMPANY,

                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Mississippi

_____

Before GARWOOD, JONES, and STEWART, Circuit Judges.

GARWOOD, Circuit Judge:[*]

    In this diversity case, plaintiffs Gary and Amanda Lee appeal

the district court's grant of summary judgment in favor of

defendant DuPont.  We affirm.

**Facts and Proceedings Below**

_____

    [*]Pursuant to 5TH CIR. R. 47.5 the Court has determined that this opinion
should not be published and is not precedent except under the limited
circumstances set forth in 5TH CIR. R. 47.5.4.

On September 7, 1993, Gary Lee, an employee of independent contractor Brown & Root, was injured while disassembling a scaffold in DuPont's facility in DeLisle, Mississippi. As Lee and other Brown & Root employees were disassembling the scaffold inside DuPont's chlorinator, Lee stepped on a piece of scaffold flooring[1] that then gave way, causing him to fall onto another piece of the scaffold flooring that was still in place.[2]

At the time of the accident, Brown & Root was under contract with DuPont to perform routine scaffold construction, assuming responsibility for, *inter alia*, (1) "the employment, control, and conduct of its employees and for the injury of such employee or employees," (2) "moving . . . the materials and equipment delivered to the job site," and acknowledging that (3) "it is familiar with the nature and location of the authorized work and has ascertained the general and local conditions bearing on the performance of such work."

Lee brought suit against DuPont, claiming strict liability, breach of implied warranties, and negligence based on a theory of premises liability. His wife, Amanda Lee, joined him in the suit and claimed loss of consortium. In its initial grant of summary

_____

[1] The scaffold flooring consisted of fiberglass plates called "decking" laid on "grating." These were then laid on the scaffold frame itself.

[2] Lee testified in his deposition that he did not fall from the scaffold to the ground, but that he fell onto the same level of the scaffold upon which he was working and upon which the piece of flooring that caused the fall gave way.

judgment in February 1998, the district court dismissed all of the Lees' claims and entered a final judgment in favor of DuPont. In March 1999, however, the district court granted in part the Lees' timely motion for reconsideration and reopened the case to allow for the possibility that the Lees might show that DuPont had retained *de facto* (as opposed to contractual) control over the scaffold and that the scaffold was defective. On March 20, 2000, the district court granted DuPont's second motion for summary judgment, not having found any genuine issues of material fact as to DuPont's *de facto* control, any evidence of defects in the scaffold at the time it was turned over to Brown & Root, or any facts that would have put DuPont on notice of any dangerous condition in the scaffold. On March 27, 2000, the district court dismissed the case.

On the Lees' appeal, this Court initially affirmed the district court's grant of summary judgment. *Lee v. E.I. duPont de Nemours & Co.*, 230 F.3d 822, 823 (5th Cir. 2000) (*Lee I*). Following the Lees' petition for rehearing, however, the panel revised its opinion and vacated the judgment. *Lee II*, 249 F.3d 361, 362 (5th Cir. 2001); *Lee III*, 249 F.3d 362, 364 (5th Cir. 2001).

In its revised opinion, the panel explained that Mississippi law generally insulated owners from liability in suits by a contractor's employee. *Lee III*, 249 F.3d at 364. If, however, the

3

owner "retained a substantial 'right of control over the performance of that aspect of the work that has given rise to the injury,'" the owner could be held liable. *Id.* (quoting *Magee v. Transcon. Gas Pipe Line Corp.*, 551 So. 2d 182, 185 (Miss. 1989)). As the Lees had not appealed the district court's holding that the contractual control over the scaffold had been delegated to Brown & Root, the panel explained that the right of control could still be established by *de facto* control. *Lee III*, 249 F.3d at 364–65. The panel went on to hold that neither DuPont's ownership of the scaffold nor its right to audit Brown & Root's work were sufficient to establish such *de facto* control. *Id.* at 365. The panel also pointed out that under Mississippi law, evidence of subsequent remedial measures was generally admissible and relevant to the issue of past control. The panel then remanded the case to the district court with the instruction to consider "the effect of the Lees' remedial measures allegations on its grant of summary judgment." *Id.* at 366.

On September 24, 2002, the district court on remand granted DuPont's motion for summary judgment on the issue of subsequent remedial measures. The Lees timely filed a notice of appeal, purporting to appeal both the district court's September 24, 2002 order and its March 27, 2000 order. DuPont moved for dismissal of the appeal as it pertains to the March 27, 2000 order, and we granted that motion on January 27, 2003.

4

## Discussion

The Lees argue that the district court erred by granting summary judgment on the issues of whether DuPont 1) had *de facto* control of the assembly and disassembly of the scaffold and the area encompassing the scaffold, 2) supplied a defective scaffold to Brown & Root, and 3) negligently failed to maintain the scaffold. The Lees' *de facto* control argument is based on the combination of DuPont's alleged remedial measures following Lee's injury, the safety regulations that DuPont established and with which Brown & Root had to comply, DuPont's right to audit and inspect the scaffold, and DuPont's ownership of the scaffold.[3]

As to the Lees' *de facto* control argument, we affirm the district court's grant of summary judgment. With respect to the Lees' other arguments, we hold that they are precluded by the law of the case doctrine and the mandate rule and, therefore, we decline review.

## I. Law of the Case Doctrine and Mandate Rule

"An appellate court decision rendered at one stage of a case constitutes the 'law of the case' in all succeeding stages." *Knotts v. United States*, 893 F.2d 758, 761 (5th Cir. 1990). An issue will be precluded from reconsideration by the law of the case

---

[3] Even though the Lees allocate a significant portion of their brief to highlight evidence of DuPont's ownership, safety regulations, and right to audit, they do correctly clarify that they are not arguing that *de facto* control can be established solely upon these bases. Our previous opinion would preclude such an argument. *Lee III*, 249 F.3d at 365.

"regardless of whether the issue was decided explicitly or by necessary implication." *Crowe v. Smith*, 261 F.3d 558, 562 (5th Cir. 2001).

A corollary of the law of the case doctrine, the "mandate rule provides that a district court on remand must implement both the letter and spirit of the [appellate court's] mandate, and may not disregard the explicit directives of that court." *Id.* (internal quotations and citations omitted). Where "further proceedings in the district court are specified in the mandate [of the Court of Appeals], the district court is limited to holding such as are directed." *Id.* (internal quotations and citations omitted).

On March 20, 2000, the district court held that the Lees had failed to meet their summary judgment burden with respect to whether DuPont had turned over a defective scaffold to Brown & Root or whether there was a latent defect in the scaffold about which DuPont should have known and of which it failed to warn Brown & Root. On March 27, 2000, the district court dismissed the case with prejudice, and on April 7, 2000, the Lees filed their notice of appeal.

In our original opinion in this case on October 31, 2000, we explicitly rejected the Lees' argument that DuPont had supplied a defective scaffold to Brown & Root. We stated that the district court found "no evidence of the alleged defect in the scaffold at the time it was turned over to Brown & Root, nor any facts that

would have put DuPont on notice of any dangerous condition in the scaffold. We affirm." *Lee I*, 230 F.3d at 823. We also stated that evidence of remedial measures was admissible under Mississippi law as to the issue of past control, but that it was "unclear . . . whether in this context such remedial evidence would be sufficient on its own to establish *de facto* control." *Id.* at 825. We did not, however, decide the issue, "because even assuming that *de facto* control existed, DuPont is still insulated from suit because of the 'intimately connected' exception to premise owner liability." *Id.*

Following our initial opinion, the Lees timely filed a petition for rehearing, in which they argued that the panel had erred in its interpretation and application of the "intimately connected" exception with respect to DuPont's alleged *de facto* control. The crux of the Lees' argument was that control by DuPont, *de facto* or otherwise, was still relevant—regardless of the "intimately connected" exception.

On April 19, 2001, we granted the Lees' petition in part and issued a revised opinion, replacing "We affirm" with "We vacate and remand." *Lee II*, 249 F.3d at 361; *Lee III*, 249 F.3d at 364. Our revised opinion omitted any discussion of the "intimately connected" exception and rewrote and expanded the remedial measures analysis, holding that the evidence of remedial measures "must be considered in conjunction with the plaintiffs' broader allegation

7

of *de facto* control." *Lee II*, 249 F.3d at 361-62; *Lee III*, 249 F.3d at 365-66. As the district court had yet not addressed the remedial measures issue, we vacated the grant of summary judgment and remanded the case with the specific instruction for the district court to consider the "effect of the Lees' remedial measures allegations on its grant of summary judgment." *Lee III*, 249 F.3d at 366.

Other than these changes, our revised opinion was identical to our original opinion. *See Lee II*, 249 F.3d at 361. Just as in the original opinion, other than to acknowledge the district court's finding that there was no evidence of a defective scaffold, we did not discuss any further the issues of supplying a defective scaffold or DuPont being on notice of any dangerous conditions in the scaffold. *Lee I*, 230 F.3d at 823; *Lee III*, 249 F.3d at 364.

Our previous opinion in this case, because of the law of the case doctrine and the mandate rule, forecloses the Lees' arguments that DuPont supplied a defective scaffold to Brown & Root and that DuPont negligently failed to maintain the scaffold. In light of the Lees' arguments in their petition for rehearing—which dealt exclusively with the proper relationship between *de facto* control and the "intimately connected" exception to premises owner liability—the lack of variation between the two opinions indicates that we have already decided the issue of whether DuPont supplied a defective scaffold to Brown & Root. Our revised opinion, just as

8

the original, would still have affirmed the district court's decision on this issue were it not for the then-unconsidered remedial measures allegations. Furthermore, our mandate from the previous opinion instructed the district court to consider "the effect of the Lees' remedial measures allegations on its grant of summary judgment," thus limiting the scope on remand to that issue alone.[4] *Lee III*, 249 F.3d at 366.

Moreover, the issue of DuPont supplying a defective scaffold to Brown & Root is also precluded by our grant of DuPont's motion for a partial dismissal of this appeal as it pertains to the March 27, 2000 order. The district court granted DuPont's motion for summary judgment on September 24, 2002, addressing only the issue of remedial measures, as directed by our mandate. The Lees subsequently filed their notice of appeal on October 23, 2002, appealing both the district court's September 24, 2002 order *and* its March 27, 2000 order. The district court's March 27, 2000 order granted summary judgment in favor of DuPont on several issues, including the defective scaffold issue. By granting

---

[4] Both the law of the case doctrine and the mandate rule have the same exceptions to their application: "(1) The evidence at a subsequent trial is substantially different; (2) there has been an intervening change of law by a controlling authority; and (3) the earlier decision is clearly erroneous and would work a manifest injustice." *United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002). None of these exceptions apply here, and the Lees do not make any argument otherwise. No evidence concerning whether DuPont had supplied a defective scaffold to Brown & Root was before the district court on September 24, 2002, or is before us now, which was not before the district court on March 20, 2000. The Lees merely argue that our previous opinion did not decide the issue of whether DuPont supplied a defective scaffold. This argument is simply incorrect.

DuPont's motion for partial dismissal, we have expressly limited the scope of this appeal to the district court's September 24, 2002 order granting summary judgment on the issue of subsequent remedial measures.

In any event, we have found no evidence that the scaffold was defective when it was turned over to Brown & Root and no facts that would have put DuPont on notice of latent defects in the scaffold and of which DuPont failed to warn Brown & Root.

## II. *De Facto* Control and Subsequent Remedial Measures

### A. *Standard of Review*

We review a district court's ruling on a motion for summary judgment *de novo*. *Lee III*, 249 F.3d at 364. Summary judgment is proper if the court determines that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Id*; FED. R. CIV. P. 56(c). The court views the "evidence in the light most favorable to the nonmoving party." *Lee III*, 249 F.3d at 364. A material fact is one that "'might affect the outcome of the suit under the governing law,' and a 'dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Sulzer Carbomedics, Inc. v. Oregon Cardio-Devices, Inc.*, 257 F.3d 449, 456 (5th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 106 S.Ct. 2505, 2507 (1986)).

### B. *Material Facts under Mississippi Law*

"Because this is a Mississippi-based diversity action, we look to the substantive law of Mississippi to determine whether . . . genuine issues of material fact exist." *Lee III*, 249 F.3d at 364. Under Mississippi law, evidence of subsequent remedial measures is relevant to show that an owner had control, and therefore may be a material fact. *Id.* The evidence must show that "'the owner maintained substantial de facto control over those features of the work,'" or in other words, "'control over the performance of that aspect of the work,'" "'out of which the injury arose.'" *Id.* at 364–65 (quoting *Magee*, 551 So. 2d at 186). The "feature of the work" out of which Lee's injury arose is the process of disassembling the scaffold. The evidence must also tend to show that DuPont had such control *at the time of the accident*. *Sumrall v. Mississippi Power Co.*, 693 So. 2d 359, 365 (Miss. 1997). Furthermore, while remedial measures evidence is relevant to the issue of *de facto* control at the time of the accident, and therefore admissible, it is not conclusive. *Id.* Thus, evidence of subsequent remedial measures may create a genuine issue of material fact if, when seen in the light most favorable to the Lees, a reasonable jury could find that such measures, along with other evidence, indicate that DuPont did have control over the disassembly process at the time of Lee's injury.

C.   *Evidence of Subsequent Remedial Measures*

Having read the summary judgment evidence, we hold that, even when viewed in the light most favorable to them, the Lees have not produced evidence of subsequent remedial measures by DuPont that, alone or together with other evidence, creates a genuine issue of material fact as to DuPont's *de facto* control over the disassembly process when Lee was injured. Lee's accident occurred on September 7, 1993. Immediately after the accident, the disassembly process was halted briefly, and DuPont and Brown & Root personnel began an investigation inside the chlorinator.[5] This initial investigation inside the chlorinator appears to have involved only asking in general terms what had happened—with the work crew describing what they thought had happened—and the taking of photographs by a Brown & Root employee. Later that day and following the initial on-site investigation, the same Brown & Root crew that had begun the disassembly process recommenced that project—without any further safety instructions or modifications to the disassembly procedures from either DuPont or Brown & Root—and the crew finished the disassembly either that day or the next.

Some days thereafter, a committee was formed to investigate Lee's accident. The committee was chaired by a DuPont employee and consisted of both DuPont and Brown & Root personnel, but it was

---

[5] In addition to this initial on-the-scene investigation, the investigation also involved a meeting on the day of Lee's accident.

12

apparently run by a Brown & Root employee.[6]  In time, the committee issued an injury investigation report with three recommendations: (1) publicize at all Brown & Root safety meetings; (2) provide a method to secure the grating to the supporting structure to prevent the scaffold from shifting during assembly and disassembly; and (3) develop a standard maintenance procedure (SMP) for assembly and disassembly of the scaffold, with a daily usage check sheet.[7]  The responsibility for the first recommendation (publicizing) was assigned to a Brown & Root employee (Ed Cooper), while the other recommendations (providing a method to secure the grating and developing a SMP) were each coassigned to one DuPont employee (Rubilynn Tucker) and one Brown & Root employee (Jay Funderburk).  When the report was issued, the first two recommendations were listed as "Done," and the recommendation to develop a SMP had a target date of October 30, 1993.

Some days following Lee's accident and the disassembly of the scaffold, at the request of Rubilynn Tucker, Brown & Root employees reassembled the scaffold to see if it could be "made better."  While reassembling the scaffold, the Brown & Root employees came up

---

[6] Gerald Van Pelt, a DuPont employee, testified in his deposition that while he was the committee chairman—because of being the manager over the area involved with the investigation—the committee was actually run by Ed Cooper, a Brown & Root employee.  The Lees do not present any evidence to show otherwise, other than the report itself, which lists Van Pelt as the chairman.

[7] It appears that the report was issued on or after October 8, 1993.  The report lists the second recommendation as "Done."  Other evidence indicates that when the report was issued, the second recommendation was indeed complete and the recommendation was closed in DuPont's corrective action reporting system on October 8, 1993.

13

with the idea of making the fiberglass pieces comprising the decking lighter and bolting these pieces to the grating and to the scaffold frame. The Brown & Root crew developed the specific ideas and decided how to do it, but the modifications had to be reviewed and approved by Tucker of DuPont. The method to secure the grating to the supporting structure was provided by October 8, 1993, and the actual modifications to the scaffold design were made sometime before January 1994.

The evidence shows that the third recommendation—a new procedure for the assembly and disassembly of the scaffold—was *never* implemented. In fact, the evidence indicates that the Brown & Root employee responsible, Funderburk, told Tucker that the SMP that was in place at the time of Lee's accident was sufficient.[8]

In addition to actions that came out of the injury investigation report, DuPont also implemented other remedial changes regarding the chlorinator and the scaffold: (1) installing and requiring the use of retractable safety lines in the chlorinator to provide fall protection; (2) sandblasting all scaffold structural steel to check it for cracks prior to assembly; and (3) requiring everyone who works on the scaffold to be certified. Although the safety lines were installed by January

---

[8] One witness, Van Pelt of DuPont, testified in his deposition that he thought that the SMP had been developed. His testimony, however, was based merely upon the fact that the recommendation had been closed in DuPont's corrective action reporting system and not upon any personal knowledge concerning the SMP. In fact, one of the persons that he assumed would know about its development, Tucker, expressly testified that the SMP had not been developed.

1994, before the scaffold was assembled again in the chlorinator, the sandblasting and certification procedures were not implemented until early 1996—nearly two and a half years after Lee's accident.

None of these remedial measures subsequent to Lee's injury could justify a finding by a reasonable jury that DuPont had *de facto* control over the performance of the scaffold disassembly work at the time of Lee's injury.  At best, these measures are merely evidence of DuPont's ownership of the scaffold and chlorinator area and its right to impose safety regulations and to conduct periodic inspections.  We have already held in this case, however, that alone, DuPont's ownership and its safety regulations and inspection rights are not evidence of *de facto* control.  *Lee III*, 249 F.3d at 365.

A comparison of this case with the Mississippi Supreme Court's decision in *Sumrall v. Mississippi Power Co.*, 693 So. 2d 359, 365 (Miss. 1997), guides our analysis.  In *Sumrall*, Mississippi Power hired an independent contractor to install a new discharge system for its fly ash pond.  During the project, which involved digging a deep trench, Sumrall, an employee of the independent contractor, was injured when a dam retaining water began to leak.  Sumrall sued Mississippi Power to recover damages under the theory that Mississippi Power would be liable for the negligence of the independent contractor if Mississippi Power retained or exercised control or had the right to control the manner and method of the

15

work. *Id.* at 361-62. The jury returned a verdict in favor of Mississippi Power. *Id.* at 362.

On appeal, the Mississippi Supreme Court held that the trial court had abused its discretion by excluding evidence of subsequent remedial measures by Mississippi Power. *Id.* at 365–66. The excluded evidence indicated that after the accident, the project was shut down while a Mississippi Power project engineer sought technical support from engineers employed by Southern Company Services, the company hired by Mississippi power to design the new discharge system. *Id.* at 361, 364. Southern Company Services's engineers then designed "sheet pilings" to prevent the walls of the excavation from caving in. *Id.* at 364–65. The independent contractor then installed the sheet pilings and proceeded to finish the discharge system installation project. *Id.* at 365. The court found "that the evidence that Mississippi Power shut down the project after the accident and brought in engineers to ensure the safe completion of the project, although not conclusive, was relevant to whether Mississippi Power had control [over the installation project] at the time of the accident." *Id.* The court then remanded for a new trial, instructing that the evidence of the subsequent remedial measures be admitted under a limiting instruction. *Id.* at 366.

The evidence in the case *sub judice* is quite different from that in *Sumrall*. Although the scaffold disassembly project was

16

halted following Lee's accident, there is no evidence that DuPont, or anyone else for that matter, did anything to ensure its safe completion. The evidence shows that following a brief delay, the project resumed the same day as the accident—without any further instructions or modification to the process or to the personnel doing the work—and was completed that day or the next. When compared to *Sumrall*, the evidence before us does not create a genuine issue of material fact as to DuPont's *de facto* control over the disassembly process at the time of Lee's accident.

## Conclusion

For the reasons set forth herein, the district court's grant of summary judgment is

AFFIRMED.

17